## CATALIN CORPORATION OF AMERICA v. CATALAZULI MFG. CO., Inc., et al.

### No. 7299.

District Court, E. D. New York.

July 18, 1935.

Prindle, Bean & Mann, of New York City (Alan N. Mann, George T. Bean, and

604

E. W. Scherr, all of New York City, of counsel), for plaintiff.

Jacob M. Zinaman, of New York City, for defendants.

GALSTON, District Judge.

This. is a patent infringement suit in which infringement is alleged of letters patent No. 1,854,600, granted April 19, 1932, to Fritz Pollak and Alfons Ostersetzer, for an improvement in a method for making phenol-formaldehyde condensation products, and for the product itself. Claims 1, 2, 3, and 5, all method claims, are in issue. The usual defenses of invalidity and non-infringement are asserted.

The specification as originally filed was found objectionable in form and content by the Examiner and led to several requests on the part of the Examiner for clarification. He finally demanded that "idiomatic English be employed." In its present form it presents a description of an important invention. The art is one which has been made known to the public through the so-called "Bakelite" products. Stated briefly the advance claimed by the inventors of the patent in suit is that the products made pursuant to the processes described are workable on the lathe or the like and are not brittle as were the products of the prior art.

Phenol is the chemical name for carbolic acid which ordinarily is found in the form of crystals. Commercial formaldehyde is sold in the form of a solution in water.

Phenol and formaldehyde were long used in making condensation products and the use of an alkali as a catalyst was also well known. Thus no novelty is claimed in the materials used in the process, nor is it contended that there is any novelty in the proportions suggested. The novelty has to do with a process which produces a novel physical structure and when narrowed down to the ultimate distinction has to do with the dispersion of water in the process.

In the earlier art the materials were of the Bakelite type of transparent ambers. The process involved drying over a long period of time and eliminated substantially all the water from the structure of the product. The result was a material very hard and very brittle. The object of the invention of the patent is obtained by keeping water in minute dispersion in the final product. The product of the patent can be worked on a machine such as a lathe, which it is claimed could not be done with the products of the prior art. We have then the anomalous situation of two products chemically identical but physically different, resulting from a difference of process of production.

The novelty is referred to in the specification in the following terms:

"The inventors have been successful in producing final products of the said reaction, which have the structure of true gels, as they include demonstrate capillarities. The artificial material made according to this invention has, in comparison with the known phenol-formaldehyde condensation products, the advantage that they can more easily be worked."

The inventors explain that in order to obtain these machine-workable products by the known reaction of formaldehyde upon phenol, the condensation products must be in a state of extremely fine dispersion with a slight degree of hydration, and must be stable. They found first that it is necessary to enlarge the molecule of the phenol-formaldehyde condensation products. This is effected by using larger quantities of formaldehyde than were theretofore usual. The inventors say that the most favorable results were obtained at the ratio of one molecule of phenol to about two and a half of formaldehyde.

The next step is to bring the condensation products having such chemical constitution to a state of colloidal dispersion.

The specification points out how this colloidal dispersion can be best obtained:

"This is preferably achieved by starting from systems of highest dispersion, that is to say from totally or partly molecular solutions, and by reducing the degree of dispersion down to the colloidal dispersion according to the principle of the colloid-chemical 'condensation method.'"

The third step is the conversion of this sol to a gel:

"The colloidal solution of a hydrophilic condensation product thus obtained is a clear sol, from which also on cooling no resin is precipitated, but which on the contrary in the course of a slowly proceeding concentration, sets to a true jelly by including the dispersion medium still present, namely the water."

The resultant jelly product is then hardened by heat, and the final product a dry

and hard gel, the pores of which contain particles of water of colloidal size, is obtained.

The technical features of the art were explained by plaintiff's expert, Dr. Neville. It seems that in the course of the phenol-formaldehyde reaction, when equal mols of the material are used with a small amount of condensation agent, when they are first mixed they form a single phase, homogeneous solution. As the reaction continues, an insoluble product is formed which separates as a lower layer. This lower layer consists of phenol and formaldehyde. The upper layer consists of water with unreacted products dissolved in it.

Dr. Neville explained that gels such as the inventors sought as the final stage are produced from sols, i. e., colloidal dispersions. A sol is a liquid comprising water and a hydrophilic substance present in the form of particles which are larger than molecules but not large enough to be visible even under the microscope. Soap and gelatine, for example, dissolve with water to form more viscous liquids, and are illustrations of sols. Now the gels which result from sols are produced when the particles in a sol change so as to develop a definite structure while still remaining hydrophilic, so that no visible separation takes place. The essential condition in the change from the sol to the gel structure is that the hydrophilic substance forming part of the sol be changed prior to any change which renders the material positively hydrophobic, so that water is precipitated, but owing to the previously formed structure of the mass, i. e., the gel, the water is in the form of exceedingly small droplets.

A number of photomicrographs were introduced, showing the fine microscopic structure of those capillary cells.

The plaintiff, through Dr. Neville, presented studies to prove statements in the patent that it was advantageous to increase the ratio of formaldehyde to phenol to produce the two-phase system. As a result of his tests, he concluded that the ratio of phenol to formaldehyde should be in excess of the 1–1 ratio, perhaps in the ratio of 2 mols of formaldehyde to 1 of phenol up to a ratio of 3 mols of formaldehyde to one of phenol, and that the product showing the best commercial characteristics lies perhaps in the ratio of 2.25 to 2.5. Since, however, the plaintiff has disclaimed any novelty based on the determination of

that ratio by the inventors, it will not be necessary to dwell on the subject further.

The commercial adaptation of the process of the plaintiff indicates that phenol and formaldehyde are brought together in a ratio of 1 to 2.35. They are condensed in the presence of an alkali such as caustic soda, 3 per cent. being used. The reaction takes place at a temperature of 65 degrees centigrade or thereabouts, and is continued for about two and a half hours. During that time resin has been substantially formed. The water is removed from the solution as a by-product in the reaction by a vacuum distillation. During that time the temperature falls to about 35 or 40 degrees centigrade, and in order to compensate for the reduction, heat is applied to the reaction vessel. This is continued for about eight hours, until the resin is brought back to a temperature of about 60 degrees centigrade. Acid is then added to neutralize the caustic soda and to give it a slightly acid reaction. After the addition of the acid, the vacuum is continued for the purpose of taking off a considerable quantity of water. Thompson, the plaintiff's chemist, said:

"The final stages of the vacuum distillation are watched carefully and samples are taken periodically to determine the water content.

"Now, we prefer to do this by taking a sample of resin from the kettle and placing it on a knife in cold water. That resin congeals, and if it is hard when pressed between the thumb and forefinger, we consider it finished.

"This comes after some experience, and the man can tell very closely just when the reaction has reached the end point.

"It is comparable, of course, to the manufacture of candy from a sugary syrup. There, of course, the water is taken off in vacuum until such time as a sample taken from that sugar becomes hard and brittle in cold water. Or probably a better example would be the manufacture of currant jelly. If a sample is taken off periodically, we find that—at the end stage at which enough water has been removed—that the sample congeals in cold water and the jelly at that stage is ready to cast.

"Now, the casting of our resin, after it has reached the end point and sufficient water has been removed, is accomplished, as one skilled in the art will understand, as, for example, casting into an open mold, either a glass or metal mold.

"If more translucent products are desired, we prefer to add glycerine. This gives us a wider range, as far as color is concerned, and enables better uniformity.

"After the resin has been cast into molds, it is then put into ovens at about 75 degrees centigrade, and the heat is maintained at that temperature, plus or minus a few degrees, until the resin has been fully hardened to the infusible, insoluble stage, but during the first curing the resin changes from a transparent product, as you see in that one bottle there—that product—to a gel which remains transparent for possibly 20—15, 20 hours and then as heat progresses this gel eventually is converted to the hard, infusible, insoluble product."

The question is then whether the process as thus used by the plaintiff is a departure from the teachings of the patent, or whether the patent is in its disclosures insufficient to apprise one skilled in the art how to pursue the process.

Certainly the patent is specific in respect to the ratio of phenol to formaldehyde. The patent also indicates that it was old from the known condensation of phenols with formaldehyde to use small quantities of condensing agents. Caustic soda is specifically mentioned in the patent. Moreover, the patent teaches the use of a vacuum for the thickening of the resin. The degree of absorption is reduced by evaporating in the water. It is true that neither the temperature at which the reaction takes place nor the period of application of the heat in order to bring the resin back to 60 degrees centigrade is indicated in the specification. But it must not be forgotten that the art is an old one, having been practiced for many years prior to the filing of the application for the patent in suit.

The patent does disclose the addition of the acid to neutralize the alkali and to throw the mass on the acid side, also, of course, the final heating of the material to bring it to a hard gel. So that in all there is a sufficient disclosure in the patent of a process which would convert the sol to a gel with the water dispersion.

■ Defendant's counsel, persistently throughout the trial, sought to develop that the patent was insufficient in its teachings to enable an ordinary workman to follow its instructions, ignoring the fundamental proposition that a disclosure is sufficient if addressed to those skilled in the art. There was no proof by the defendant that the disclosures were insufficient to that latter class of persons.

The claims at issue are the following:

"1. A process for the manufacture of condensation products of a phenolic body and formaldehyde, which comprises producing a colloidal solution of a condensation product the composition of which is in the proportion of 1 molecule of phenolic body to about 2.5 molecules of formaldehyde, in the presence of excess of alkali, neutralizing the excess alkali and thereafter removing sufficient water from the sol to give a gel and thereafter hardening the gel by heat.

"2. A method of making non-transparent condensation products of formaldehyde with phenolic bodies, by heating a reaction mixture having approximately the proportion of 1 molecule of phenolic body to about 2.5 molecules of formaldehyde, at any stage of the condensation process in the presence of a condensing agent having an alkaline reaction, the quantities of such condensing agent being such as to prevent precipitation of the condensation product by such heating step, whereby the latter remains dissolved, the solution being thereafter neutralized and then thickened by heating, the sol thus produced being allowed to gelatinize and the gel being finally hardened by heating.

"3. In the process of claim 2, the step of effecting the final hardening in the presence of a weakly acid menstruum.

"5. Process for the manufacture of condensation products from a phenol and formaldehyde, distinguished thereby that a reaction mixture containing a phenol and an aldehyde, approximately in the proportion of 1 mol. of phenol to 2.5 mols. formaldehyde at least in the last phase of the condensation process, in the presence of alkaline reacting condensation agents in an amount corresponding to at least 0.32% by weight of NaOH as compared with the weight of phenol, is heated so that the condensation product does not precipitate but remains in solution, whereupon the solution is neutralized and then thickened by heating, the sol thus formed allowed to gelatinize and the gel obtained hardened."

The validity of these claims is attacked on the ground of anticipation. Four patents are relied upon.

That to Backeland, No. 954,666, issued April 12, 1910, is for a varnish. The dis-

closure in this patent does not show the production of a sol. The inventor says:

"In order to carry out my invention I may proceed as follows:—Equal amounts of commercial carbolic acid and commercial 40% formaldehyde solution are made to react upon each other in presence of a base. Water is separated and the obtained product afterward dissolved in a suitable amount of solvent."

This passage, together with a reference to a separation of the liquid mixture into two superposed layers, indicates layer separation. Secondly, the preferred ratio is 1 to 1. Although Baekeland does say that the proportion of formaldehyde can be widely varied to obtain acceptable results, it does not appear that the layer separation is avoided. Moreover, the process is alkaline throughout. This would mean that water is separated and substantially eliminated and that a homogeneous resin phase results which is not a sol and therefore cannot be developed to a gel.

Patent No. 1,111,288 to Aylesworth, issued September 22, 1914, relates to a process for forming compositions comprising phenol condensation products suitable for molding into desired forms and objects. Two classes of compositions are defined; one which requires only to be compressed in a heated condition, by which means a compact hardened mass is obtained without any conversion into a nonplastic or infusible state, and the other a composition which is converted by further reaction under the application of heat, or heat and pressure, into a nonplastic infusible and insoluble condition. The former class is rapid molding. The second class requires more time. With the first class we are not concerned. The preferred ratio of phenol to formaldehyde is 1 to 1. This patent, like that to Baekeland, is insufficient as an anticipation because it does not teach the formation of a sol and its subsequent conversion to a gel. The process operates entirely in the alkaline condition. Aylesworth states:

"The acid, which may be carbonic or sulphuric, should be used in just the proportion to exactly neutralize the base, or in a little less proportion than sufficient to neutralize all of the base."

Knoll British patent, No. 6430 of 1911, relates to an improvement in a process for hardening condensation products of phenols and formaldehyde, which consists in causing the latter to act on the condensation mixture during or before the hardening while introducing a small quantity of a condensing medium in order to obtain a colorless or lightly colored product. The initial condensation is brought about by alkaline catalysts, such as sodium carbonate or ammonium carbonate. To the viscous mass thus obtained a considerable quantity of hydrochloric acid is added. Dr. Neville says that the reaction causes rapid development of hydrophobic properties and the immediate release of the bound water. The following passage is pertinent:

"For the purpose of hardening, the product thus obtained is treated with a (about) 20% hydrochloric acid solution, until it becomes a tough mass; the latter is rapidly rinsed with water and pressed in molds in which it hardens perfectly white by short heating to 80 degrees centigrade."

The water aggregates in large instead of small droplets and in that respect differs from the process of the patent in suit.

Flood for the plaintiff, for the purposes of the trial, endeavored to carry out the processes of this patent as well as those described in the Lorival British patent, No. 156,675, and the Baekeland and Aylesworth patents heretofore referred to. His first attempt to carry out example 1 of the Knoll patent failed. With the second attempt he obtained a resin insoluble, which separated into two layers when the catalyst was neutralized. Following the instruction of example No. 2, when the hydrochloric acid solution was added, the water immediately separated out, leaving a white tough mass which had to be pressed in molds. The process does not describe a gel, nor is one shown by the photomicrographs.

In British patent No. 156,675, Lorival seeks by varying the catalyst to produce transparent bodies like glass or opaque such as ivory or porcelain, without the introduction of foreign bodies which would diminish the strength of the product. In all of the ten formulae suggested by the inventor, hydrochloric acid is employed. As in the Knoll process, a gelatinous precipitate of a soft material is thrown out. When hardened by heat, this will become transparent because the droplets of water can still escape while the mass is soft. Flood, following the disclosure of the patent, obtained a solid white mass which became hard by heating for a very short time. Under the microscope this sample showed no structure at all, in other words, no such globules of water as appear in the photomicrographs of the three samples

made by Flood following the instructions of the patent in suit.

Apparently the Lorival process, in comparison with the process of the patent in suit, falls short in the same way as does the Knoll process, in that a gelatinous precipitate is produced and not a gel.

From the foregoing, I find that none of the four patents anticipates any of the claims in suit.

In addition to the foregoing patents, defendant relied on a number of other patents to show the state of the art. These were grouped by Dr. Neville into three classes; one in which the process shows a layer separation occurring while the system is alkaline; a second in which the ratio of formaldehyde to phenol is not greater than 1 to 1 by weight; and the third in which the process is conducted on the alkaline side throughout. The existence of any one of these three conditions defeats the value of the reference.

U. S. patent No. 942,699, issued December 7, 1909, to Baekeland. This patent shows a use of equal volumes of phenol and formaldehyde. A layer separation occurs while the system is alkaline and the process is conducted on the alkaline side throughout.

U. S. patent No. 942,809, also issued to Baekeland, December 7, 1909, shows the process conducted on the alkaline side.

U. S. patent No. 1,310,088, issued July 15, 1919, to Redman, Weith, and Brock, is interesting because it makes specific reference to the fact that the phenolic condensation products are adapted to be worked on a machine. The process will not yield a gel and is conducted on the alkaline side throughout.

British patent No. 6429 of 1911, to Knoll is also on the alkaline side. No gel is produced.

British patent No. 159,461 to Bakelite-Gesellschaft. This patent proposes to manufacture artificial fusible and soluble resins by the action of formaldehyde on phenols with catalytic alkaline oxides and to transform the initial product under the action of concentrated organic acids into insoluble infusible products. Dr. Neville criticizes this patent because the layer separation occurs while the system is alkaline. In the two examples illustrating the invention, it is evident that 110 parts by weight of phenol and 85 by weight of formaldehyde are suggested in the first example, and in the second 100 parts by weight of cresol and 80 parts by weight of formaldehyde, i. e., the mol ratio is approximately 1 to 1.

British patent No. 191,417 to Kulas. Dr. Neville states that the layer separation occurs while the system is alkaline.

British patent No. 217,595 to Mehta describes a process in which phenol and formaldehyde are used in approximately equal molecular weights. The process is on the alkaline side throughout.

British patent No. 182,886 to Dehn prescribes equi-molecular weights of phenol and formaldehyde.

German patent No. 281,454 to the Bakelite-Gesellschaft. The suggested ratio of phenols to formaldehyde in this patent is three parts by weight of formaldehyde to five parts by weight of purified carbolic acid. These are boiled in a loosely closed vessel until the mixture assumes a milky appearance. Then the liquid is transferred to an open vessel and concentrated until it reaches a tough and thickly liquid consistency. Then it is dried until it is entirely hard. The inventor found that acid in the manufacture of the condensation product could be dispensed with if the reciprocal action between phenols and aldehydes is properly conducted. Certainly this is not the process of the patent in suit, for in the preferred proportions and method the process is on the alkaline side.

German patent No. 173,990 to Story employs a ratio of three parts by weight of formaldehyde to five parts by weight of purified carbolic acid. Apparently the only catalyst, if it may be so called, used in the process described in this patent is heat, and not alkalies or acids. Dr. McKee, for the defendant, admitted that "heat is not as sufficient a catalyst as are alkalies or acids."

German letters patent No. 304,985 to Ruff. This patent shows that the process remains on the alkaline side.

French patent No. 478,884 to Eilertsen. Phosphoric acids are specified. These are relatively strong acids and a uniform gel could not be obtained. The purpose of adding the phosphorous acid is to take out all traces of water.

German patent No. 140,552 to Luft. This discloses an acid catalyst and the process is acid throughout.

German patent No. 157,553 to Henschke. The process described in this patent is for the production of a disinfectant powder.

The phenol-formaldehyde combination is to be separated from its alkaline solution by acidification in the form of a finely divided powder. The patent does not show the formation of a sol nor, therefore, a conversion of a sol to a gel.

U. S. patent No. 1,614,171, issued January 11, 1927 to Amann and Fonrobert. The object of this patent is not the production of resins but of polyalcohol masses, either crystallized or liquid. There is a wide variance suggested in this patent in respect to ratios of phenol to aldehyde, running as high as 1 to 6. Dr. McKee calls particular attention to example 7 of the patent, the ratio being 1 gram molecule of crystallized carbolic acid to 6 gram molecules of watery formaldehyde, and a caustic soda solution of about 10 per cent. content. The mass is allowed to stand from five to ten hours at the temperature of the room and the product formed is precipitated by means of a weak acid. The inventors say since the condensation product formed is readily soluble in water, it is advisable to concentrate the liquid before or after the acidulation at atmospheric pressure or in vacuum and to accelerate and improve the separation of the oil by an addition of common salt. The obtained final product is a thin brown oil which gives off quantities of formaldehyde when heated. Dr. McKee did not make it clear how the process of this patent in any of the nine examples given describes the conversion of a sol to a gel.

U. S. patent No. 1,020,594, granted March 19, 1912, to Aylesworth relates to compositions for molding various articles, such as may be obtained from celluloid and hard rubber, and to the process for forming them. In the process, the ultimate infusible product is formed by incorporating an amount of anhydrous formaldehyde with a phenol resin. The process does not produce a sol.

U. S. patent No. 1,475,446, issued November 27, 1923, to Pollak and Mohring is likewise unavailing to the defendant because the process does not produce a gel. It reverses the process of the patent in suit in that the condensation is brought about in an acid condition and the final product is in an alkaline condition. The patent specifies the use of 100 grams of phenol and 100 grams of formaldehyde, and, curiously enough, the specification states in direct contradiction of the plaintiff's patented process:

"Attempts to increase the amount of formaldehyde have already been made, as well for alkaline as for acid artificial resins; they have, however, given unfavorable results for both kinds of resins."

U. S. patent No. 1,216,728, granted February 20, 1917, to Pollak states the invention to relate to a process for the production of insoluble products by the catalytic action of acids. The process is on the acid side throughout. A layer separation is indicated in example 2. The patent shows no evolution from a sol to a gel.

U. S. patent No. 1,710,019 to Deutsch and Thorn, issued April 23, 1929. The process employs 1 kilogram of phenol and 1 kilogram of formaldehyde in the form of a 40 per cent. solution. Two examples are disclosed, the first involving the use of sodium carbonate, sodium benzoate, and sodium salicylate. The process is alkaline throughout. In the second example provision is made for the addition of benzoic acid. The purpose of adding the excess of acid is stated to be to increase the color fastness of the final product. Example 1 recited that in the process the water is expelled, but "it is not necessary to expel the whole of the water." The residue of distillation is hardened. In example 2 again it is stated that the water is expelled and hardened as above described. All of the claims relate to a volatilization of free water. There is nothing in this patent to indicate that water is to be found within the hardened final product in the form of minute drops of colloidal size. The ratio of phenol to formaldehyde employed would also indicate a very brittle product.

For example, the impact tests charted on Plaintiff's Exhibit 19 show the increase in energy required to break the specimen starting with a ratio of 1 and reaching a maximum at 2.50. The same result is reached with the tension tests recorded on the chart reproduced in Exhibit 21. From this chart it appears that the tensil strength of the product rises to a maximum in the general ratios of 1 to 2.35, or 1 to 2.50. Dr. Neville employed a third type of physical test shown in the chart offered as Exhibit 23. This records compression tests. Dr. Neville found that in low ratios the sample showed no deformation until the yield point was reached and then it shattered explosively; that for the sample in the 1 to 1 ratio "it was impossible to collect a portion of the sample larger than a

finger nail; with a loud ring it shattered and went all over the testing laboratory."

A piece of the cube used for the test in the 1 to 1.25 ratio showed a shatter characteristic of brittle material. This was true of the sample of 1 to 1.50, which while having a higher compressive strength, behaved as brittle material. Its brittleness decreased in the range of from 1 to 2.25.

The conclusion from these physical tests which seemed to me to be convincing was that in order to produce a product which has commercial value it is necessary to use a ratio of phenol to formaldehyde which is considerably in excess of the 1 to 1 ratio, the best characteristics being shown between the ratios of 2.25 to 2.5.

Concerning the alleged prior art, I may say that during the course of the trial so many patents were used by the defense to illustrate the state of the art that I was led to inquire of Dr. McKee whether he had tried out any of these prior art processes. The witness said that he had not made such experiments as he had been only a short time in the case. That seems unfortunate, for it would have been a matter of considerable interest and, I think, of importance, had the defense offered testimony of that kind; or indeed if products made under any of these prior art patents had been offered in evidence with some proof of the processes employed. Of course, it is recognized that the weight to be accorded ex parte experiments, particularly in chemical cases, is not great, but there is nothing before me in effect to refute Dr. Neville's tests, Mr. Flood's experiments, and the photomicrographs of Dr. Allen.

I conclude that the claims in suit are valid. In passing, however, I should point out that much has been made in the defendant's brief, as it was in the course of the trial, of the statement made by the solicitor who prosecuted the application for the patent in suit, that he agreed with the comment of the Examiner who noted that the crux of the invention of the patent in suit was the alleged discovery of the ratio of 1 to .2.5. The defendant fails to point out how either the statement of the Examiner or the agreement of the solicitor led to any amendment of the claims because of any cited reference of the prior art. The defendant apparently ignores the unmistakable emphasis with which it has been held in this circuit and elsewhere that arguments made in the file history are not ad-

missions unless they are accompanied by an actual change in the language of the claim necessitated by the references. Campbell Metal Window Corporation v. S. H. Pomeroy & Co., Inc. (D. C.) 300 F. 872; A. G. Spalding & Bros. v. John Wanamaker (C. C. A.) 256 F. 530.

There remains for consideration the question of infringement. Defendant admits that it follows the plaintiff's commercial process, but urges that the plaintiff's process differs from the process of the patent in suit.

Answers to interrogatories submitted before the trial admitted that the reaction between the phenol and formaldehyde was conducted in the presence of an alkaline agent; that that alkaline agent was neutralized or acidified during the process; that when the material was put into the molds it was liquid; that there was no separation of the reaction products from other ingredients of the mixture at any stage of the process prior to pouring it into the molds, nor did it become insoluble in the other ingredients of the mixture at any stage of the process prior to being poured into the molds; that phenol and formaldehyde were caused to react in the presence of an alkali while still remaining in solution and thereafter the alkali was substantially neutralized or the solution acidified and water removed without throwing the reaction products substantially out of solution.

In addition to the admissions made in the interrogatories and in the chart offered by the defendant, Exhibit H, disclosing defendant's process, there was direct testimony by Poerschke, a former employee of the defendant. This witness testified that in the defendant's process they used proportions of phenol and formaldehyde equivalent to 1,010 pounds of 40 per cent. formaldehyde to 500 pounds of phenol, which indicates that the molecular ratio is 1 to 2.377.

It is significant that there is no denial of Poerschke's testimony, except that given by Dr. McKee, who testified concerning the mol ratio employed in two batches or kettles of material, but Dr. McKee's observation was made on February 2, 1935, after the suit had been started and there is no proof to show that the proportions employed on that day were the same as theretofore employed. Certainly the defendant had other witnesses available who could have testified in reply to Poerschke if con-

tradictory testimony was available. Certainly, therefore, it is proper to receive Poerschke's testimony as proof of the mol ratio. Philadelphia Rubber Works Co. v. United States Rubber Reclaiming Works (C. C. A.) 229 F. 150.

Defendant's attempted explanation that the use of lactic acid does not neutralize the mass because it is already neutralized is not convincing. It is much more reasonable to believe that the defendant's mixture of phenol, formaldehyde, and caustic soda is not a neutral solution. Certainly Dr. Neville in the test in open court on a fresh sample of material from plaintiff's runs proved that the mixture of phenol, formaldehyde, and caustic soda was definitely alkaline and that a very substantial amount of lactic acid had to be added to neutralize it.

Finally it may be observed that heat was employed by the defendant to harden the gel.

Comparing now the defendant's process with the claims in suit we find the defendant employs a process embracing the following steps:

1. The production of a colloidal solution of a condensation product, the composition of which is in the proportion of 1 molecule of phenol body to about 2.5 molecules of formaldehyde.

2. An excess of alkali is employed.

3. The excess of alkali is neutralized.

4. Thereafter water is removed from the sol to give the gel.

5. The gel is hardened by heat.

Thus claim 1 is infringed.

Claim 2 is substantially claim 1 except that it includes the limitation of heating the reaction mixture. This claim is sought to be avoided by the defendant on the ground that the claim requires the heating of the solution while the alkali is present, whereas the defendant heats the solution before any alkali is added. The claim also differs from claim 1 by providing for the thickening of the solution after neutralization by heating. Defendants thicken before the acid is added. If the separate heating and mixing of the materials produced a different result, one would be inclined to question the equivalency of the step by step process employed by the defendant as compared with the process of the claim; but the separate heating and mixing of the materials are conducted in circumstances that bring about the reaction with full equivalence. Accordingly claim 2 is infringed.

In claim 3, the final hardening is in the presence of lactic acid. This claim is infringed.

Claim 5 introduces the limitation as to the amount of alkaline reaction condensation agent, setting a minimum of 0.32 per cent. by weight. Flood testified that in the sample of defendant's product analyzed he found 1.755 per cent. of caustic soda. This claim is therefore likewise infringed.

It may be remarked in conclusion that none of the claims limits the temperature at which the various processes are to be performed. The product is substantially the same, whether the initial reaction is carried on at a high or a low temperature. It may be noted too that the claims say nothing about the necessity of reflux condensers being used and consequently there is no necessity for including in the disclosure an explanation that cooling is necessary if such a reflux condenser is not employed.

The plaintiff may have a decree in accordance with the foregoing opinion.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.