**DEWEY & ALMY CHEMICAL CO. et al. v. MIMEX CO., Inc.**

**Civil No. 368.**

District Court, E. D. New York.

Jan. 24, 1941.

John W. Hoag, of New York City, and Dike, Calver & Gray, of Boston, Mass. (George P. Dike and George P. Towle, Jr., both of Boston, Mass., of counsel), for plaintiff.

James & Franklin, of New York City (Maxwell James, of New York City, of counsel), for defendant.

GALSTON, District Judge.

This is a patent suit involving the alleged contributory infringement of letters patent No. 1,582,219, issued April 27, 1926, on the application of Hopkinson and Dewey for a seal for cans and other containers; and direct infringement of patent No. 1,-765,134, issued June 17, 1930, on the application of Dewey and Crocker for a sealing composition.

The specification of the former patent recites that the invention relates to seals for the joints between the bodies and covers of containers from which air is to be excluded and in which liquid or some liquid contents are to be confined. It is especially intended for use in open top metal cans in which no solder is employed but in which the head is secured to the body by "double seaming". The double seaming is effected by rolling or spinning together the edge of the can cover and a small flange which has been previously pressed out from the bottom of the can into a double seam. The sealing is brought about by the compressive confinement, between the surfaces of the container body and the cover, of a material consisting of a rubber base, deposited directly from a water-emulsion of rubber.

Reference is then made to sealing devices of the prior art which include rubber gaskets, paper gaskets or backings, and rubber cement solutions. Rubber gaskets are stated to be expensive and difficult to apply and are subject to deterioration; paper gaskets are said to require special machinery and entail difficulty of application. Rubber cements, having a viscosity greater than that contained in a half pound of rubber per gallon of solvent, were believed by the inventors to give difficulties in manipulation in the ordinary machines.

Accordingly, the invention of the patent seeks to utilize rubber to secure the advantageous properties "inherent in ample

volume of elastic material, permanent retention of elasticity, compressibility and unbroken continuity, and substantial immunity to deterioration by exposure to air, heat and light.",

The specification recites: "The invention * * * is characterized in its broader aspect by the use of a water-emulsion of rubber exemplified by that which also occurs naturally as rubber latex, as the material from which to produce by deposit a sealing composition."

In operation the latex emulsion is introduced into a machine and applied through a nozzle to the part to be sealed. The emulsion thus deposited is then dried. When a natural latex is employed the evaporation of the liquid and drying of the deposit is stated to involve a primary coagulation of the particles of liquid rubber with no appreciable injury "to the protective colloid which is deposited in association with the rubber."

The patentees state that the latex employed may be obtained from the rubber tree, and where it is to be conveyed for a distance a percentage of ammonia is preferably added for preservative purposes. It is also specified that with the latex various fillers, such as carbon black, zinc oxide, ground cork, coloring materials including dye-stuffs and pigments, may be combined. Comparing the advantage of the latex with the prior art, the patentees observe that it contains approximately 2.75 pounds per gallon of solid constituents as against one-half pound of rubber to one gallon of solvent in the case of cements.

All of the claims of the patent are in issue. The defendant denies infringement and alleges invalidity and laches.

It will suffice to discuss Claim 1 as typical. The claim reads: "A container closure provided with a sealing material deposited thereon comprising as its basis rubber characterized by substantial conservation after drying of the integrity of rubber particles dispersed in water-emulsion."

The language of the claim which described the material as one "comprising as its basis rubber, characterized by substantial conservation after drying of the integrity of rubber particles dispersed in the water-emulsion" amounts to no more than a statement of the inherent qualities or properties of latex. One of the questions presented, therefore, is whether there was any invention in adapting the substance

"latex", theretofore known in the rubber art, to the new use or combination described in the patent.

British patent No. 1801 of 1791 to Peal includes a reference to caoutchouc and its applicability to leathers and cloths and other articles intended to be rendered water proof. Dr. Hauser, plaintiff's expert, who I may say proved a most interesting witness both for his unusual attainments in the field and his directness in response to questions, admitted that one Fourcroy, also as early as 1791, suggested a direct use of latex. Dr. Hauser conceded also that latex could be preserved by the addition of an alkali.

British patent No. 5122 of 1825 to Hancock for the purpose of preserving various textile and other articles from injury from air or moisture refers to the use of the juice obtained from certain hevaea trees which grow in several parts of South America, the East Indies, and other places abroad. The inventor says: "I find that the said juice or liquid, when exposed to the open air in the sun, or in a warm room, becomes inspissated or dried and then forms a substance exactly resembling * * * and well known by the names of caoutchouc or India rubber or elastic gum. In colour and consistence the said juice very much resembles cream."

British Patent No. 467 of 1853 to Johnson gives the specific instruction for purposes of preservation during transportation found in the patent in suit. The patent recites: "Shortly after the milk or juice is collected it is strained, and has then added to it a quantity of the concentrated liquor ammonia * * *." The following passage is also of significance: "For the protection of a new and useful article of manufacture from this substance, it is poured or run onto plates of glass or polished metal or other suitable receiving surface * * *. In this condition it is subjected to slow atmospheric evaporation, either in the open air or at the ordinary atmospheric temperature * * *. By this treatment the liquid portion of the spread-out mass is dissipated, leaving behind it a solid mass, very elastic and tough * * * and possessing properties distinct from all other known substances."

It is important to note that Dr. Hauser admitted that such films as Johnson obtained did not differ in any respect from the films that are obtained by Hopkinson and Dewey.

British patent No. 7694 of 1905 to Morisse adds nothing to what has been said and is merely cumulative with respect to the use of alkali in combination with latex. He says: "* .* * it is of great interest to be able to transport the lactiferous juices in a liquid state." That he succeeded in accomplishing by the addition of an alkali.

British patent No. 24,680 of 1914 to Milne, in addition to recognizing that the latex, prior to, during, or after evaporation, might be treated with any suitable preservative to prevent decay, also suggests that latex could be used as a sealing agent.

United States patent No. 1,006,098, issued October 17, 1911, to Kannenberg, is of interest only because of the combination defined therein of a can cover provided with a seaming flange "having a thin, continuous, strong, hard, firm elastic and innocuous seam packing coating thereon, consisting of rubber, a rubber solvent and zinc-oxide * * * said coating being on the peripheral portion only of said seaming flange, and firmly adhering to the tin coated surface of said seaming flange."

United States re-issue patent No. 12,-959, issued May 25, 1909, to Brenzinger, relates to a method of forming covers for sheet-metal cans. It is stated that the can cover is to receive and retain in proper position the liquid composition "which upon being applied thereto, will upon drying form a uniform unbroken and evenly distributed film or lining."

United States patent No. 1,341,489, issued May 25, 1920, to Wester, for a can sealing composition, in so far as prior art to the Hopkinson and Dewey patent is concerned, adds only the suggestion of a filler to give body to the compound.

With this rich prior art it is difficult to say what inventive contribution was made by Hopkinson and Dewey. The claims define a product: The combination of a container closure with latex. A study of the file wrapper, however, discloses that the application as originally filed describes the invention as "a composition comprising rubber useful as a packing or filler for sealing the seams or joints of tin or other containers." Not one of the seventeen claims originally filed is for the combination of the claims in suit. Each was for a sealing composition of which the main constituent was latex.

The original application was filed April 28, 1922, and though several actions of the Patent Office and amendments in response thereto were filed by the applicants, it was not until their amendment of November 16, 1925, that the composition claims were canceled and combination claims of container and sealing material were substituted. In the circumstances it is reasonable to infer that the inventors believed before their application went through the evolutionary stages that their contribution consisted in a new sealing composition. Certainly, however, they did not discover latex nor its properties. At most they found a use for latex as a sealing compound in a can cover —but that "act" was not so "non-analagous" as to suggest invention.

■ From another viewpoint invention must seriously be doubted here. At most, what Hopkinson and Dewey did was to substitute a different sealing composition from that which was theretofore known in an old cover. The combination then in the claims is that of a can cover with a groove and a sealing compound deposited in the groove. It is a well recognized principle that the substitution of materials does not constitute invention unless indeed a wholly different effect results from the substitution. It is true that certain advantages are claimed but the mere difference in degree is not such as to warrant the finding of invention. Other rubber compounds had been used; rubber gaskets had been employed. By and large what the inventors did was to find some material which would serve more adequately than those theretofore used. The Dewey letter to Almy, of January 31, 1922, contains the passage: "Hopkinson asked me why I used Up River coarse para. I told him that it was to get minimum viscosity with maximum rubber content. He said: 'Why not use latex and get 33% rubber?' "

The suggested use does not connote patentability. See United States Rubber Co. v. Sidney Blumenthal & Co., 2 Cir., 98 F. 2d 767; also Bassick Co. v. Hollingshead Co., 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251, followed by Lincoln Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008, which hold that the improvement of one part of an old combination gives no right to claim that improvement in combination with other old parts which perform no new function in the combination.

■ The defendant is charged with contributory infringement only, for it does not make, use or sell the article of the claims. The latex sold by the defendant to the can manufacturer is an unpatented product. Leitch Manufacturing Co. v. Barber Co., Inc., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371, following Carbice Corporation v. American Patents Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819, holds that one charged with contributory infringement in the sale of unpatented material which is sold with the knowledge that it is to be used in practicing the invention, cannot be enjoined for the reason that the control of the supply of unpatented material is beyond the scope of the patentee's monopoly. The limitation upon the scope or use of the patent is "inherent in the patent grant".

■ I conclude that the Hopkinson and Dewey patent in suit is neither infringed nor valid.

The defense of laches is also urged but no proof beyond the facts stipulated was adduced; and those facts are not sufficient to establish the defense.

The second of the patents in suit is for a sealing composition.

The stated objects were to secure plasticity and viscosity of the sealing composition. The machine employed for depositing the material runs at a very high rate of speed. Difficulties encountered with the latex described in the Hopkinson and Dewey application indicated that the composition was too fluid to meet the conditions of operation. The latex spattered. To make the composition commercially available the inventors concluded that they had to adapt their compound to existing machines rather than the machines to the new compound. They found that a material known as bentonite when added to latex produced plasticity without obliterating fluidity.

Bentonite, like latex, is a product of nature and is classed as a clay. Among its properties is that of swelling considerably when water is introduced. However, the mixture of bentonite and latex alone in the extrusion machines was objectionable too, for the composition splashed and to some extent was not controllable. Then to meet that difficulty they added "karaya gum". With this mixture it was found that the rate of flow could be controlled and the necessary viscosity obtained. Such a composition, said the inventors, had the three properties most desirable for sealing purposes and necessary for efficient mass production in a commercial machine.

All the claims of the patent are alleged to have been infringed, and the defendant admits infringement.

Most pertinent of the prior art patents is British patent No. 1053 of 1855 to Newton. The specification describes a mode of preparing colors for printing upon or staining fabrics. The colors (mineral pigments) are first reduced to a finely divided state, are carefully mixed with liquid caoutchouc. When the mixture is required to be thickened, gum, glue or other thickening material may be employed. It is stated that if the pigments are not sufficiently fine they might be ground "in an indigo mill or in any other suitable manner". Newton said that in order to give to the material a sufficient consistency and to prevent the pigments from settling, the gum juice might be thickened by evaporation or by incorporating with it gum tragacanth, or any gums or substances generally employed as thickeners. The method of evaporation of the liquid itself he described as expensive and added that where any of the gums are employed they are likely to be washed out before the color is entirely set. Accordingly, the inventor discovered that thickening of the caoutchouc liquid was necessary. He noted that each of the articles alone would coagulate when exposed to the moisture, the liquid separating from the solid portions, but when mixed they no longer undergo such change, "but become much less fluid than they were before being commingled, and are thereby rendered of a suitable consistence to be mixed directly with the pigments."

This British patent was cited by the Patent Office during the prosecution of the application for the patent in suit. The examiner found in the Newton patent a composition consisting of rubber latex, pigments and gum tragacanth. He noted that United States patent No. 1,498,387 to Kirschbraun described the use of bentonite in making a water emulsion of rubber and an aqueous paste. Accordingly, the examiner concluded that there was no invention in substituting bentonite for the pigments of Newton. Newton was definite and specific. The examiner observed that when the pigment is ground in an indigo

mill, as Newton instructed, the particles are colloidal "without any doubt" and added: "The application of the science of colloids to Newton's patent would merely be a logical development of the art, without involving any inventive faculty, and without giving substantially different results from those patented by Newton."

Further prosecution of the application led the examiner to admit that the conditions of use of the sealing compound appear to be quite critical. Thus he was concerned "with the dilemma that materials disclosed in the prior art do not work in the same way, while applicant is seeking claims covering a range of equivalents which is not disclosed and no suggestion made in the original disclosure how the nature of an equivalent may be determined. If a disclosure is so indefinite as to equivalents that it is impossible to determine whether it is made in a reference or not, any broad claim based on such a disclosure must necessarily be so indefinite that it will be impossible to determine whether it is infringed or not. * * * With reference to bentonite, applicant used expressions as 'an otherwise inert, plastic, colloidal substance,' 'an essentially inorganic material,' 'highly plastic colloids and colloidal earths or colloidized material' to indicate some equivalents which 'might be found to be suitable for this purpose.' It is clearly intended to be implied that not all materials answering the general description will work, and this is probably a fact."

A careful consideration then of the terminology found in some of the claims of the patent led the examiner to observe: "Broadly, the modification of latex by the addition of both a viscosity-increasing factor, and plasticity-increasing factor, utilizing the former as a controller or regulator of flow during the application of the composition and the latter as a preventive of flow and uneven distribution of the composition after application and during the drying period, is disclosed in this patent (i. e. British patent No. 1053 of 1855, to Newton), or else it must be assumed to be inoperative for the purpose described. Whether the particles have the precise characteristics of bentonite particles appears to be immaterial. The examiner is unable to give the expression 'highly plastic colloids and colloidal earths or colloidized material' any limited interpreta-

tion which would imply any capability of forming a permanent suspension in water. At most it is considered that the material has a particle size corresponding approximately to that termed 'colloidal'." The examiner concluded that the patent to Newton is a reference to any generic expression based on the original disclosure of Dewey and Crocker.

To this argument of the examiner, Egan, who testified at the trial and who is the chief chemist of the Dewey and Almy Chemical Company, filed an affidavit in opposition wherein he said that for many closures the Dewey-Crocker specific combination of bentonite and karaya gum is ideal; but he added that for reasons of expediency it had been found desirable to use other materials of the types specified as viscosity and plasticity agents. Egan contended that an essentially inorganic material of colloidal dimensions or particle size and colloidal in behavior, naturally or artificially hydrophilic, i. e. associated with a hydrophilic colloid, would impart the desired viscosity characteristic to latex.

Referring to laboratory study he asserted that such inorganic substances as whiting, alumina, iron oxide, lithopone, etc., when associated with a hydrophilic colloid, would serve as equivalents for bentonite and gum karaya in association with latex to produce the factors of plasticity and viscosity.

There followed an appeal from a rejection by the examiner of the broad claims of the application, the claims to the specific composition of latex, gum karaya and bentonite having been allowed. A very careful and intelligent discussion is shown in the examiner's statement to the Board of Appeals wherein he concludes that the appeal claims, i. e. the broad claims, are either anticipated by the prior art or indefinite by reason of doubt as to what is covered thereby, or based on new matter, or broader than the disclosure. The opinion of the Board of Appeals was that the appeal claims were not anticipated by the art cited by the examiner. Of the Newton patent, the board said that it disclosed a rubber latex composition of such plasticity as made it applicable to printing on fabric, and added: "but we are not satisfied this reference discloses the sealing composition of the claims or that the gum and colloidal earth could be so used to produce the ma-

terial which would serve the purposes contemplated by the applicants. The applicants urge, and we are not prepared to dispute them, that the added materials disclosed in the British patent coagulate the latex and the resulting composition would be unsuitable for sealing purposes."

Reference to the Newton patent shows that he knew how to preserve latex by the addition of ammonia. In respect to the vexed question of coagulation, it appears that he claimed the use of uncoagulated latex, whether mixed or not with other substances, as a vehicle for the application of coloring matter, and means of rendering it more or less liquid. If in fact Newton's claim was sound in that regard, then the applicants' argument during the prosecution of the case in the Patent Office was unsound. At the trial defendant's expert Miller produced certain samples which he said were made under the instruction of the Newton patent. They were made with rubber latex 38%, i. e. ordinary commercial rubber latex, preserved with ammonia and with tragacanth, one of the gums mentioned in the Newton patent, and with various fillers.

One sample was made containing French yellow ochre, which is a natural mineral pigment. The sample consisted of 175 parts by weight of ochre, 5.4% of tragacanth solution which has been alkalized with ammonia, 175 parts; and 38% latex, 150 parts. Material was made up by intermittently mixing the yellow ochre with the tragacanth solution and then subjecting that mixture to a run through a so-called colloid mill. It is to be noted that these compounds, that is to say the compound of the patent and those of the prior art, are physical mixtures rather than chemical compounds. Therefore a thorough mixing of the ingredients is called for. When the sample was exhibited at the trial it was found to be homogeneous, with no clotted or coagulated particles. Sample No. 2 was made in exactly the same way as No. 1, except that the pigment was an ultramarine blue instead of yellow ochre. This pigment was known in Newton's time, as was yellow ochre. This sample proved to be homogeneous when exhibited at the trial. No. 2a was a sample also made with ultramarine blue with ammonia. The ammonia was "pepped" out of the tragacanth solution. Other samples made pursuant to the Newton instruction showed freedom from coagulation.

It is contended by the plaintiffs that all the materials mentioned by Newton, the thickening agents, gum, glue or tragacanth, unless carefully prepared by alkalization, will coagulate latex; and that the modes mentioned in the Newton text involve thickening by coagulation, and moreover that not one of the ingredients mentioned by him is noncoagulating. Such at least was the argument used by the applicants in the appeal before the Board of Appeals in the prosecution of their application. Though the gum which Newton added undoubtedly thickened the latex, there is no reason to conclude that it coagulated the compound. It is also true that Newton, by using alkali, sought to avoid, and if the Miller samples are to be relied on did, avoid coagulation. The ground asserted by the Board of Appeals in reversing the examiner was that they were not "prepared to dispute * * * that the added materials disclosed in the British patent coagulate the latex." In further answer to such argument, to show utility, Miller applied the compounds to fabrics as Newton did. He ran the compounds, using the several pigments separately, French ochre, ultramarine blue, chrome yellow, red lake, red oxide of iron and satin white, also through a standard can-end lining machine, producing can ends with the latex composition deposited in the seaming flanges.

Did these Miller compositions follow the teaching of the Newton patent? There is always some question concerning the weight to be accorded to ex parte experiments. Catalin Corporation of America v. Catalazuli Mfg. Co., D.C., 11 F.Supp. 603. Miller said that he used a standard colloid thickening mill for making the color paste, i. e. the pigment and gum, and used an ordinary lightening mixer for mixing the color paste with the latex, and that these were thoroughly mixed, for Newton taught that the pigment was to be reduced to a finely divided state and to prevent settling had to be incorporated with the gum.

It is true that Professor Hauser criticized certain of the liquid composition samples and said indeed that his examination of the Miller specimens, with the exception of two samples, led him to conclude that they were agglomerated i. e. that they were in an incipient stage of coagulation to a varying extent. Accepting Dr. Hauser's criticism for the moment, the fact remains that he admitted that at least two samples following the teaching of

Newton would appear to meet, and in my opinion did meet, Claims 3, 4, 8 and 9 of the Dewey and Crocker patent. It is true these claims all refer to "solid suspensoid particles associated with a hydrophilic colloid dispersed in the latex" and that the Newton patent makes no reference to the term "colloid" or "colloidal". It must be remembered though that the science of colloids was not known in Newton's time. But that fact would be of no importance if the materials that enter into the composition fell within the description of the claims, as apparently they do.

The issues are thus narrowed to the specific claims which recite the combination of latex, gum karaya, and bentonite— Claims 1, 2, 6 and 7, and Claim 5 which defines a composition comprising latex and bentonite with no reference to a gum.

For an understanding of the scope of these claims it is necessary to consider the material known as bentonite. It is a colloidal clay and its plastic qualities were apparently recognized at least as early as April 17, 1919, the date of the filing of the application of Kraus for United States patent No. 1,509,406. Kraus sought to increase the plasticity of clay and other mineral substances having a limited degree of plasticity by adding thereto a certain proportion of fine grained minerals having greater absorptive power for water than the clay or other material to be improved in plasticity and attaining a higher percentage of colloidal matter than such clay or other material. Among the minerals suitable for use as plasticity-improving agents he mentions bentonite.

Hancock British patent No. 3093 of 1864 discloses a composition consisting of latex mixed with a mixture of pigments ground very fine in water alone or in paste, size or gum. Since the pigments or mineral matter, as disclosed in the prosecution of the application for the patent in suit, are deemed to have colloidal qualities, though perhaps not to the same degree as bentonite, it would appear not to involve invention to substitute bentonite for the minerals of either Newton or Hancock in order to obtain the plasticity-giving factor sought by the patentees in suit. One must seek to pierce the highly scientific terminology and phrasing of the specification and claims of the Dewey-Crocker patent to understand exactly what they deemed their invention to be. It is only by so doing that a determination can be made as to whether they in fact performed an inventive act. In somewhat bare outline it may be fairly stated that having found latex alone could not be used satisfactorily in an extrusion machine because of its degree of fluidity, they concluded that to meet the conditions of operation of the extrusion machine, the physical properties of the sealing composition had to include viscosity and plasticity. In gum karaya and bentonite they found the materials which respectively supplied those stated requirements. But gums had been known over the years as a thickening or viscosity agent; and certainly as far back as 1855 it was known that pigments, or finely ground minerals such as clay, would yield plasticity. Finally Kraus in 1919 discovered the inherent plasticity value of bentonite. Thus when Dewey and Crocker posited their problem the prior art afforded all the data for its solution.

The plaintiff in its opening, referring to Dewey and Crocker, stated: "They felt they had to adapt their compound to existing machines rather than the machines to the new compound." Dewey testified that as their customers modify the can-lining machines they have to modify their compounds. Though such changes in a compound, he said, were minor, yet the plaintiffs' compositions have a range of viscosity of from 16 to 100 and a range of plasticity of from .8 to 2.0. It is true that Dewey said that in their laboratory it took a number of men a period of time to work out the problems involved, but by and large, it would seem on his frank statement of adaptability of formula in the ranges of viscosity and plasticity noted, to a change in machines, that essentially the skill and knowledge of the artisan rather than an inventive act yielded the conclusion reached in each case.

In passing it may be observed that other patents of the prior art disclosed viscosity and plasticity agents in combination with latex. Biddle re-issue No. 16,476 refers to latex, casein as the viscosity factor, with ingredients such as calcium carbonate and sodium silicate as filling materials supplying the plasticity factor. United States patent to Dunham, No. 1,334,356, refers to the treatment of karaya gum for the purpose of making a thickening agent; and is of some importance because it describes the treatment of karaya gum with a small amount of alkali, as is suggested in Claim 1 of the patent in suit.

Then too the question of invention by Dewey and Crocker must be considered in the light of the disclosure in the Hopkinson and Dewey patent and its file history; and of British patent No. 196,881, which they assigned to General Rubber Company, with which company the plaintiffs are associated. The convention date of the British patent was April 28, 1922. The patent follows generally the disclosure and claim of invention in the first of the patents in suit and contains this paragraph: "The invention also includes the method of sealing * * * consisting in using as a sealing composition rubber latex with a quantity of a colloid or of an organic or inorganic filler, or both a colloid and a filler, which quantity is such that the composition is fluid at or about ordinary temperatures, and on drying deposits a film the properties of which are not materially different from those of a film deposited from latex without such addition." Later on is the passage: "Where possible the substitutions added to the latex may be in the colloidal condition. Gums are added to the latex by dissolving in a suitable medium (for example, gum Arabic is soluble in water) and stirring the solution into latex."

Thus it appears that Hopkinson and Dewey anticipated Dewey and Crocker, for the clay and gum of the British patent appear to be the equivalents of the bentonite and gum karaya of Hopkinson and Dewey. It may be noted too that in the application of Hopkinson and Dewey, as originally filed, there was this passage which was afterwards cancelled: "In addition it may be understood that there may be combined with the latex, either in the presence of the components just mentioned or without those components, various fillers, such as carbon black, zinc oxide, other coloring materials than Para Toner including both dye stuffs and pigments, soaps, gelatines, gums, cork, paper or other deformable material, starches, inorganic substances and varying quantities of other solvents." The components referred to in that passage apparently are "oils, glues, etc."

Whatever commercial merit attaches to the two patents in suit is ascribable in large measure to the teachings of the prior art but not to invention.

Accordingly, the complaint will be dismissed. Submit findings of fact and conclusions of law in conformity with the foregoing opinion.