## ZOTOS CORPORATION v. RADER.
### No. 7752.

District Court, E. D. New York.
Sept. 11, 1936.

John Wallace Young, of New York City (Richard E. Marine and Thomas J. Byrne, both of New York City, of counsel), for plaintiff.

Frank Hyman, of Brooklyn, N. Y. (John E. Stryker, Jr., of St. Paul, Minn., of counsel), for defendant.

CAMPBELL, District Judge.

This is a suit for the alleged infringement of three patents relating to the temperature control of exothermic (heat imparting) pads used to generate chemically sufficient heat to impart a permanent wave to hair as follows:

Patent No. 1,892,426, issued to Ralph L. Evans, assignor to Zotos Corporation, for method of and means for permanently waving hair, granted December 27th, 1932, on an original application filed January 21, 1932. Divided and this application filed September 22, 1932.

Patent No. 1,894,032, issued to Ralph L. Evans, assignor to Zotos Corporation, for method of and means for permanently waving hair, granted January 10, 1933, on an original application filed January 21, 1932. Divided and this application filed September 21, 1932.

Patent No. 1,919,690, issued to Ralph L. Evans, assignor to Zotos Corporation, for method of and means for permanently waving hair, granted July 25, 1933, on an application filed January 21, 1932.

The plaintiff is vested with title to all of the patents in suit.

The plaintiff is a New York corporation.

The defendant, doing business under the trade-name of Rader Beauty Supply Company at Brooklyn, N. Y., within the Eastern District of New York, is a jobber of hair treating products and engaged in the sale of "New Ray" exothermic pads manufactured by Raymond Lee, who is conducting business under the trade-name Raymond Laboratories, at St. Paul, Minn.

The defense of this suit was openly and avowedly conducted by, and on behalf of, said Raymond Lee.

Notice of infringement was duly given to the defendant, Rader, and the manufacturer, Raymond Lee.

Prior to 1905 the permanent waving of human hair was confined to hair off the head; that is, postiche puffs, curls, and transformations.

About 1905 Nèssler in England began to experiment with a method for permanently curling the hair on the human head, and, having in the meantime improved his process, in 1910 he secured his first patent covering the use of an electrical heater for the purpose of supplying heat for curling hair.

Between 1910 and 1920 Frederics and Sutter, among others, entered the field and employed electrical heaters of various forms.

In 1923 or 1924 Sartory of England perfected a machine in which quick lime, wetted with water, was used to generate heat necessary to create a permanent wave in the hair.

About 1925 Barnett, an associate of Sartory, came to the United States and organized a company known as Vaper Marcel, Inc., for the purpose of manufacturing and selling devices under the Sartory patents.

Vaper Marcel, Inc., went into bankruptcy in 1928, and its assets were purchased by Evans, the patentee of the patents in suit.

Although the predecessor of the plaintiff, with the same organization and management, earnestly endeavored to develop and successfully market the Sartory machine from 1928 to 1932, the Sartory system proved to be a commercial failure.

Other systems, such as steam generated from a central boiler and conducted to the hair through tubes, were evolved about this time for permanent waving.

Hair waving operators were confronted with the problem of the control of generated heat during the delay period to permit of the adjustment of the electrical or other heater about the strands of hair wound upon the mandrels without burning the hands of the operator, to provide a period of acceleration immediately following the delay period during which the temperature would quickly rise to a point where the moisture in the strand would be heated to boiling temperature, and to maintain an extension period during which the heat was maintained at the boiling temperature until the wave was set.

Only partial success was attained in the attempt to solve this problem in the electrical machine, which depended on the skill of the operator, and, where that skill was not displayed in the use of the machine, frequently resulted in serious burns.

In the use of the Sartory machine, which closely followed the practices in the electric machine method, and in effect substituted a chemical heater for an electrical heater, even more reliance was necessarily placed upon the skill of the operator, for its control.

In 1931 a small pad containing exothermic material capable of producing a permanent wave in the hair came to the attention of Dr. Evans, patentee of the patent in suit, who was the plaintiff's chemist and had formerly been a member of the faculty of Columbia University, and plaintiff acquired the rights thereto.

The active principle of that pad, like the Sartory pad, was calcium oxide or lime, which, when wetted with water, would generate heat sufficient to impart a permanent wave to hair, but, like the Sartory practice,

it was ungovernable. It did not provide for a definite period of delay, it had no controlled acceleration, and no controlled extension.

Unlike Sartory, it was designed to operate without a metal shell such as he used to overcome the dangers in the use of lime.

Dr. Evans testified that during a test of the pad, wrapped around a thermometer, an explosion occurred, scattering the hot lime over his face, which convinced him of the necessity for a proper control of the reaction.

He then addressed himself to the development of means to overcome these disadvantages and do away with the use of a machine during the hair waving operation.

Evans was not the inventor of the machineless hair waving pad.

Nor did the Evans invention reside in the discovery of any new delayers, any new accelerators, or any new extenders.

Evans' invention was directed to a new combination of steps performed exothermically, and it matters not if the delayers, accelerators, and extenders be old and well known, as it was the combination, and not the individual elements, that was the invention.

What Evans taught was that it was possible to permanently wave hair by automatic chemical control of an exothermic pad without the necessity of using a machine for purposes of control, and how to do it. By his invention, definite periods for the several steps could be predetermined in the laboratory with a uniformity in practice impossible of accomplishment by different operators, or even the same operator at successive times, with machines.

The patentee in patent No. 1,892,426 in his specification described his invention as follows: "This invention comprises a novel method of and a novel means for controlling the development of heat generated by the self heating chemical wherein certain materials are used to extend the development of the heat over a longer period of time than could be done by the heating chemical itself."

And in patent No. 1,894,032 he described the purposes for which certain materials are used as follows: "To accelerate the development of heat."

And in patent No. 1,919,690 he described the purposes for which certain materials are used as follows: "To delay the development of the heat, or to accelerate the development of heat over a longer period of time of the heat or to extend the development than could be done by the self heating chemical itself, said materials being used also for delaying and then accelerating the natural heat development or for delaying, then accelerating and finally extending the heat development."

Defendant offered in evidence sixteen alleged prior art patents on which he relied.

Of these, only Sartory 1,565,509, Frederics 1,596,247, and Barnett 1,609,683 relate to the art of permanent waving of hair.

Sartory 1,565,509 and Barnett 1,609,683 relate to improvements in the so-called Sartory machine method of permanent waving, in both of them the generation of heat exothermically was from straight lime alone (or its equivalent), which had no inherent control whatever, and required special and complicated mechanisms including suspended metal cylinders or shells to prevent danger of explosions injuring the customer. Both of these patents were cited as references by the Patent Office, but the patent in suit issued over them.

Frederics 1,596,247 discloses a device for applying a borax solution to the hair to condition it and has nothing whatever to do with the generation of heat chemically. It certainly does not disclose the invention of the patents in suit.

The following patents, Wertheimer 1,-434,576, Wallace 1,488,656, Berkey 1,497,-970, Perrault 1,502,744, O'Neal 1,613,120, Smith 1,620,581, Baker 1,760,102, Mann 1,901,313, and Ziegler 1,910,874, relate to a heating bag to be applied to the human body in the nature of a hot water bottle, the heat being generated exothermically from suitable chemical compositions. A comparison of a Thermat heating bag (Exhibit 44), with a New Ray pad taken from a box of New Ray pads (Exhibit 4), shows that the Thermat bag is very much larger and sixty times heavier. Physically there is no suggestion inherent in the hot water bag that it might be used in place of the hair waving pad.

There is not involved in the hot packs of the type shown by those patents the specific requirements of delay, then acceleration, then extension at the high critical temperature of boiling water.

The body heating bags must be kept at a sufficiently low temperature at all times

not to burn either the hand or body of the patient, and the delay period, if existent, is undesirable and accidental, and those patents do not teach how to obtain a delay period of from one to one and a half minutes necessary in a hair waving device to enable adjustment on the head without burning the fingers of the operator.

There is no period of rapid acceleration immediately following a definite period of delay.

The development of heat in the body heating bags must extend over a period of hours with the maximum temperature in the neighborhood of 160° F., which is far below the critical temperature of boiling water, whereas the development of heat for the permanent waving of hair in order to accomplish the best results must extend only from 3 to 6 or 7 minutes, and then cool within a few minutes, so that the pad may be removed without burning the fingers of the operator.

The admission of large quantities of air is required in the body heating bag to effect the generation of heat. There is no teaching in any of those patents how air necessary for the generation of sufficient heat for hair waving could be introduced in the hair waving pad, and it is not obvious how air could be introduced in sufficient quantity to generate the required heat, nor is it apparent how a suitable temperature could be obtained if air were introduced by some means into the hair waving pad. The body heating bag and the hair waving pad are in my opinion nonanalogous arts.

The series of experiments which defendant's expert Reynolds testified he had run under the teachings of the Wallace, Perrault, O'Neal, Kirk, and Baker patents, were run in 1936, a month or so prior to the trial of this suit, at the instigation of defendant's counsel Stryker, without any opportunity being afforded plaintiff to observe them.

Reynolds states that he tested under Wallace patent 1,488,656, giving the mixture he claims to have used, and that the delay period was 25 seconds and the extension period was 430 seconds. Plaintiff's expert Snell performed the same experiment as described by Reynolds, and obtained delay period of 10 seconds and an extension period of 350 seconds. The delay in both cases was too short to be operative for hair waving.

Wallace did not disclose any of the substances used in the test, nor weights given by Reynolds. The ratio of the oxidizing agent and the electrolyte to metal is greatly distorted over that disclosed in the patent. The ingredients and proportions used by Reynolds are different than those disclosed in the patent. The patent discloses a different purpose, a temperature not to exceed 194° F., and to continue for some hours, all of which are contrary to the results obtained by the unwarranted formula adopted by Reynolds. No anticipation is shown by the use of a formula not even suggested in the patent. H. D. Smith & Co. v. Peck, Stow & Wilcox Co. (C.C.A.) 262 F. 415, 417; Radio Corporation of America v. Twentieth Century Radio Corporation (C.C.A.) 19 F.(2d) 290, 293.

Wallace did not discern any deficiency in the methods of hair waving, nor did he point out any means of overcoming them, and did not anticipate any of the patents in suit.

Reynolds employed in his test under Perrault patent, No. 1,502,744, the ingredients and proportions specified in the patent, but does not state the conditions under which the experiment was performed as to the introduction of air into the reaction. He obtained a delay period of 70 seconds and an extension period of 530 seconds. The experiment was repeated by Snell in accordance with Reynolds' testimony, but he was unable to get a temperature over 95° F., although Reynolds said he obtained a temperature of 200° F. As stated in the Perrault patent specification, the invention is designed as a substitute for hot water bottles to be applied to an invalid without discomfort, the heat to be long sustained. The Reynolds experiment was not performed in accordance with the intended teaching of Perrault, nor was the test adapted to the conditions existing in the hair waving art at any time.

Reynolds states, with reference to a test under O'Neal et al. patent, No. 1,613,120, which like the preceding ones discloses a substitute for hot water bottle or electric pad as a body warmer, that he used the materials disclosed in the patent and obtained a delay period of 60 seconds and an extension period of 600 seconds. The proportions were materially distorted.

Snell testified that he performed the same experiment with the ratios given in Reynolds' testimony, and obtained a delay

period of only 5 seconds and a hair waving temperature too brief for definite recordation. He also said that the increase in amount of potassium chlorate was far beyond the amount that was contemplated in the patent, and therefore involved a different reaction from that which he had previously discussed as being disclosed in the patent.

Reynolds in his test under Kirk patent, No. 1,729,044, which describes the disclosed device as a rectal dilator or applicator and suggests an appropriate temperature of 115° F., though indicating that a temperature of boiling water might be obtained, the heat to continue for a considerable time, used the same formula as given in the patent, but a much greater weight of the materials and a different amount of water. The delay period in reaching the temperature of 200° F. was 120 seconds and the extension period 360 seconds.

Snell testified that in performing the same experiment he obtained a delay period of 30 seconds and an extension period of 360 seconds, that Reynolds used more chemical than Kirk, and that he added more water, in ratio almost double. Snell also testified that the delay of 30 seconds obtained by him in duplication of Reynolds' test was too short a delay period, and the 150 seconds in the hair waving zone was too short a period to effect the sufficient waving of hair.

Reynolds in his test under the Baker patent, No. 1,760,102, which discloses a heat pack adapted for use on the body designed to generate heat for a longer period of time than heretofore possible, used ingredients that corresponded to those given in the patent, but the ratios of ingredients were very greatly distorted. He claims to have obtained a delay period of 120 seconds and an extension of the waving zone of 480 seconds.

Snell testified that, in attempting to duplicate Reynolds' experiment and using the same materials and quantities as testified to by Reynolds, he obtained a delay period of only 15 seconds and 400 seconds in the waving zone. Baker's object was to get a chemical heater of the hot water bag type, that it would be in the same range as Wallace, and that its period of operation would be expressed in hours. The proportions used by Reynolds were different from those used by Baker, and Reynolds did not know the actual metal content used by him.

The percentage of potassium chlorate disclosed in the patent was 1 per cent., but Reynolds used approximately 28 per cent. In the Baker mix it is essential to have air present, but in the Reynolds mix the oxidation is accomplished by the great increase in the potassium chlorate content. The disclosure of the Baker patent was not adaptable to the waving of hair.

The Murmann patent, No. 654,174, disclosed a chemical heater for canned goods; it is not adaptable for permanent waving of hair.

The Lyon patent, No. 635,472, disclosed a heat producing composition for cleaning plugged or frozen drain pipes, traps, sewers, and the like, and it is desired to give a temperature of 120° C. to 150° C. (about 248° F. to 302° F.). That temperature is too high, and it would neither be adaptable or safe as used in the waving of hair, and there is nothing in the patent to suggest a properly controlled hair waving temperature.

The British patent No. 10,379 of 1904 discloses a system of generating heat exothermically for domestic purposes such as cooking stoves, flat irons, water heaters, and the like, with exceedingly high possible ranges of temperatures, much higher than any safe permanent hair waving temperatures. This patent was cited by the Patent Office against the patents in suit, but they issued over that reference.

The Textbook of Inorganic Chemistry, vol. 3, part 1, 1925, as to the disclosure therefrom relied upon by the defendant, deals in generalizations without the teaching of any applicability thereof to the control of heat generation in particular steps essential to the permanent waving of hair, set forth above, and certainly makes no suggestion, much less teaching, of the adaptability of the ingredients of an exothermic material to hair waving art.

The Helvetica Chimica Aeta, vol. 6, 1923. What was said about the preceding paragraph applies to this citation and need not be repeated.

The defendant in discussing the prior art attempts to show that it is pertinent.

As to Berkey 1,497,970, Kirk 1,729,044, and Ziegler 1,910,874, the defendant discusses diluents which it contends was disclosed in the above patents, but in any event there is no teaching of diluents used to determine the timing operation necessary for the proper waving of hair.

As to Burr, Murmann et al. 654,174, Helvetica Chimica Aeta, the defendant's discussion of retarders and accelerators for the hydration of calcium oxide may be answered by the same comments.

As to Wertheimer 1,434,576 discussed by defendant, the introduction of air is a necessary prerequisite to the operativeness of the Wertheimer pad, but defendant does not suggest how air could be introduced into a hair waving pad in a manner to produce a hair waving temperature. He also attempts to show that iron reacts with ammonium chloride to give hydrochloric acid and anticipates Evans' accelerator of acidic material. In this I believe he is in error and accept Snell's testimony that ammonium chloride under such conditions does not generate hydrochloric acid.

As to Perrault 1,502,744, defendant is in error in the assertion that the ammonium chloride of that patent disclosure may be classified in a heat mix as liberating an acid, thereby increasing the rusting rate of iron in view of Snell's testimony which I accept. Defendant's contention as to the differences in results obtained by Reynolds and Snell, respectively, is not sustained, as I believe Snell used the same mesh as Reynolds (Rec. p. 613 X Q 246 (346), but in any event, in the absence of a substantial amount of air, it would not make any difference. What Snell said about the size of particles related only to the Kirk formula and not to Perrault. The Perrault patent not only uses air, but relies upon it alone to regulate the temperature. Perrault's mix does not have ferric oxide which would delay, but ferrous oxide which is disclosed by him (page 1, line 69, and page 2, line 8).

As to Wallace 1,488,656, he necessarily depends upon air for the oxidation of his iron which is impracticable in a hair waving pad, and defendant's adoption of an oxidizing agent in place of air is unwarranted and a distortion of Wallace's teachings. Neither is there any warrant for the substitution of copper sulphate for sodium chloride. Even with this unwarranted interpretation of Wallace's disclosure, Snell was unable to get a satisfactory performance of waving hair. The defendant is in error in contending that aluminum oxide does not delay.

As to O'Neal et al. 1,613,120, defendant's contention is that the difference between Reynolds' results and Snell's results might be due to the larger perforations in the pad, which would affect the period of delay. This, however, is beside the issue, for the claims of the patents in suit are directed to a chemical ingredient as a means of delay and not the physical construction of the pad itself, as by the modification of its perforations.

In Berkey, Kirk, Ziegler, Baker, or Mann, there is no disclosure showing that inert materials delay, nor do they teach how such materials may be employed to delay in the manner and for the purposes of solving any problem of the hair waving art.

As to Ziegler 1,910,874, it is limited to air oxidation, which excludes it from the possibility of use in the hair waving art. Ziegler does not show in any of his preferred formulas the presence of an oxidizing agent. The so-called absorptive accelerating agent, activated charcoal, employed by Ziegler, in fact limits him to the use of air, since in the presence of a powerful oxidizing agent, such as potassium chlorate, it would form a dangerous explosive. I do not agree with defendant that "the fineness of iron is a controlling factor in the temperature obtained." The last paragraph of page 2 of that patent shows that above 40 mesh very little effect is obtained by change in the mesh of iron. A comparison of 40 mesh with 100 mesh shows only the slight difference of 11° in peak temperature. This reference does not furnish an explanation, even if Snell used a different mesh of iron from Reynolds, of the great difference in temperatures obtained by Snell 95° F. and Reynolds 231° F., both using the same mixtures. Even though the mixture described by Ziegler might reach a hair waving temperature, there is no teaching how this mixture might be utilized in the hair waving art. The preferred formulas disclosed all require over 200 grams of chemical, which, multiplied by 25 to 60, is much too heavy and bulky for use on a woman's head. The formulas all require that oxygen be allowed to contact the chemical, an impossible condition with the pad disclosed in the patents in suit. The peak temperature is reached much too fast to enable the operator to effectively handle it for the permanent waving of hair, and the heat was evolved for 25 or 30 hours rather than for 6 or 7 minutes as required for hair waving. The disclosure of this patent reveals its unfitness for hair waving.

As to Kirk et al. patent 1,729,044, I do not agree with defendant's contention that

"no change whatever is necessary in the specific formula set forth in this patent to obtain a heat curve entirely satisfactory for hair waving." In his tests with reference to the Kirk patent Reynolds used a greater weight of chemical and a greater amount of water than taught by the Kirk patent, and even this mixture was unsuitable for hair waving. Defendant shows that Kirk does not rely upon a chemical in the pad itself for determining the proper period of delay, but attempts to explain the difference in Snell's results and Reynolds' results as due to a matter of manipulation and speed of delivering the water to the reactive chemicals. Instead of the size of the particles having a further effect with the Kirk formula, as contended by defendant, I agree with Snell that "with magnesium, since the reaction is a fairly rapid one it would not be as nearly as important a factor."

As to Baker 1,760,102, Snell's statement that air is essential to the operation of Baker is supported by Baker, who, at page 1, lines 60–66, mentions his copending application 99,514 (now patent 1,659,185), which describes "a casing or container particularly adapted for use in a chemical heater," for use as a substitute for hot water bags so constructed as to permit the entrance of air through minute interstices, and the supply of air and water being the controlling factors in the heat generation. This pad, as shown by Snell's tests, was impractical for hair waving, for the delay period was only 15 seconds.

As to Mann 1,901,313, the patent disclosures do not teach any method applicable to the hair waving art. Mann's type of reaction is not utilizable for the permanent waving of hair, as it is definitely limited to air oxidation of iron; that is, iron rusting or iron corrosion, which is a principle not applicable to use in a hair waving pad. The composition taught is usable only for therapeutic purposes, and the temperature reached would be insufficient to wave hair. Over a pound (454 grams) is used in each bag with two or three tablespoonfuls of water, which is 40 times the weight of the chemicals and 10 times the weight of the water that can be used in a hair waving pad. The purposes and results of the use of the materials which Mann designates as retarders, extenders, and accelerators are entirely different from those contemplated by the patents in suit. Mann states "heat is promptly generated to a predetermined

temperature for several hours." This does not suggest the hair waving method of the patent in suit, nor is it capable of use for hair waving. Not only would the temperature never reach the hair waving temperature, but, if it did, no operator would wait several hours to allow the bag to cool down sufficiently to permit the bag to be removed from the head.

The body heating art is nonanalogous to the hair waving art.

Defendant has cited from a nonanalogous art many of the alleged prior art patents and, on their disclosures, seeks to establish anticipation, and makes the statement that there could be no invention in the general thought that controls such as he alleges had been previously used in heating mixtures for other purposes could be used in heating mixtures for hair waving.

That statement finds its answer in the prior art, as well as in the nonanalogous art alleged herein as prior art, in none of which is taught delay to prevent burning the fingers of the operator in adjusting the apparatus, followed by acceleration to quickly get up to the waving zone for a time sufficient to create a permanent waving of hair.

The defendant challenges the sufficiency of the disclosure of the patents in suit and contends that the proportions of the compositions contemplated in plaintiff's patents in suit are not sufficiently disclosed. That contention is not sustained. The specifications disclose the problems involved and the method of their solution.

Patent in suit, 1,919,690, page 1, lines 23 to 28, states: "I have discovered that by controlling development of the heat generated by the exothermically acting chemical I am enabled to ensure the effective waving of the hair with a minimum liability of burning the hair or the scalp."

The specification then points out how this may be accomplished by controlling the chemical generation of heat to effect a period of delay, followed by an acceleration of the development of the heat up to the waving temperature, and its extension at this temperature for a sufficient period to effect the wave. A number of substances are specified for effecting these several operations. The proportions of these materials that would be used must be determined more or less empirically. Even the same materials, and particularly lime, vary from time to time, and it is necessary to select

the proportions by test for each batch of material used in the manufacture of the pads. The problem and results to be accomplished and the means to accomplish those results having been stated, it is left only to the skill of the ordinary chemist to determine the proportions required to produce the desired results in any given case. This is sufficient. Catalin Corporation of America v. Catalazuli Mfg. Co. (C.C.A.) 79 F.(2d) 593.

The file wrappers of the patents in suit show that Sartory 1,565,509 and Barnett 1,609,683, the only hair waving art relied upon by defendant, were cited as references by the Patent Office, as was also Parth British patent 10,379, A. D. 1904, which purports to show controls in a cooking stove and the like, but the patents in suit issued over those references and the art now relied upon by defendant is no more pertinent than was the disclosure of that British patent.

The patents in suit were not anticipated.

Defendant asserts that the specifications of the patents in suit are insufficient and the claims are broader than the alleged invention. Defendant stresses the fact that not all delayers, accelerators, or extenders that it is possible to use in the practice of the inventions of the patents in suit are disclosed in those patents. In so doing, however, it seems to me that defendant has overlooked what I have held to be the fact, that the invention of the patents in suit does not reside in the discovery of any new delayers, any new accelerators, or any new extenders, but resides in the broad concept that it was possible to permanently wave hair by automatic chemical control of an exothermic pad, without the necessity of using a machine for purposes of control. It also resides in the concept that an exothermic pad sufficiently small to permit 25 to 60 of them to be placed upon the head and sufficiently energetic in its reaction to generate a heat at the high critical temperature of boiling water could be controlled during the delay period, the acceleration period, and the extension period by the addition of chemical delayers, known to chemists, and accelerators and extenders of the prior art. These in great numbers and a variety of forms were known to the prior art, but no one had even suggested previously that the proper sequential periods of delay, acceleration, and extension definitely timed to each exacting step for permanent waving of hair could be effected by the use of such prior art delayers, accelerators, and extenders.

The invention of the patents in suit was basic, directed to a combination of steps performed exothermically, rather than to the invention of the specific ingredients employed.

Defendant contends that a class of delayers is supposed to be covered by the mere statement "certain salts such as ammonium sulfate," and that "such as ammonium sulfate" does not define or set off any group of such salts. That contention, however, is disposed of by Snell, who testified to the effect that any chemist knows the characteristics of different chemicals generally as regards their ability to delay, accelerate, and extend.

The specifications of the patents show that many substances and many classes of substances are specified for performing the several steps of delay, acceleration, and extension, and the disclosures are sufficient.

Defendant's contention that the process of the patents in suit of waving hair does not differ from that employed by Graham Barnett and Sartory is not sustained. Evans possessed the rights in this country to both of those pads, and their insufficiencies, particularly the explosion in Evans' face of a pad of the Barnett type, was the impelling motive to his invention of the exothermically controlled machineless pad in suit.

The case of Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 48 S.Ct. 474, 72 L.Ed. 868, cited on behalf of defendant, is not in point. In that case the patentee, Perkins, had invented a starch glue having substantially the properties of animal glue, in order that it might be used for the same purpose. His invention involved the same broad combination as the animal glue of the prior art, and distinguished thereover merely in the substitution of a starch of a particular character for the animal material in the combination. Glues made from other starches were well known in the art. As I read that opinion, Perkins had invented a new element or ingredient for use in an old combination, the animal glue combination, as an equivalent or substitute for the animal material constituting one of the elements of animal glue.

His invention was in the improvement of a specific element for use in a combina-

tion already old, and not as in the patents in suit for a new combination of old elements in which the several elements would be entitled to their full range of equivalents in so far as they effected the combination. By equivalent is meant an element coacting in the combination in the same way to produce the same result in the combination as the element for which it is substituted. See Morley Sewing Mach. Co. v. Lancaster, 129 U.S. 263, 286, 9 S.Ct. 299, 32 L.Ed. 715.

The Supreme Court held in the Glue Case, supra, that the law applicable to machine patents in the matter of functional claims was equally applicable in chemical cases.

The controlling decisions in machine cases are O'Reilly v. Morse, 15 How. 62, 14 L.Ed. 601 (relied upon with authorities in the Glue Case) and the Telephone Cases, 126 U.S. 1, 8 S.Ct. 778, 31 L.Ed. 863.

The Telephone Case discusses the Morse Case and points out that the eighth claim of Morse was bad because it was a claim for all means for transmitting intelligence electromagnetically.

■ The Supreme Court in the Telephone Case points out that where a new combination of elements, producing new effects by reason of the combination, is defined in the claim, the rule does not apply. The Court sustained the fifth claim of Bell for the reason that it did not claim the mere result of the apparatus but set forth the step performed by the method and apparatus in producing the desired result. The inventor of a new combination of coacting elements is entitled to the full range of equivalents of each of the elements in his claimed combination. It is the novelty of the combination as a whole, and not that of its respective elements, which is determinative of the question as it was in the Perkins Glue Case and in Grasselli Chemical Co. v. National Aniline & Chemical Co. (C.C.A.) 26 F.(2d) 305, relied upon by defendant. Evans did not, like Perkins, in the Perkins Glue Case, or like Hofmann and Gottlob, in the Grasselli Case, invent a new element of a broadly old combination, but invented a new combination of old elements, as in the Telephone Case, and not to a single element of the combination, as in the Perkins and Grasselli Cases.

■ In a proper combination claim the equivalents of an element or elements of the combination may be legally covered comprehensively by the term "means" followed by a statement of the function performed by that means in the particular combination claimed. Buono et al. v. Yankee Maid Dress Corporation (C.C.A.) 77 F.(2d) 274, 277.

■ As I have said, the invention of the patents in suit did not reside in the selection of particular delayers, accelerators, and extenders already known to the art, but in the conception of the possibility of their association in the particular way defined in the claims in issue, whereby he met the exacting conditions and solved the complicated problems in the permanent waving of hair exothermically.

The claims in suit of the patents in suit define the invention and are commensurate in scope with the actual invention; that is, with the advance he made over the prior state of the art.

The patents in suit have had substantial commercial success.

The patents in suit are valid.

This brings us to the question of infringement.

The following claims of the following patents are in suit: Patent 1,892,426, claims 1, 2, 4, 7, and 8; patent 1,894,032, claims 1 to 6, inclusive; patent 1,919,690, claims 25 to 34, both inclusive.

Claim 27 of patent 1,919,690 is typical of all claims in suit and reads as follows: "Means for waving hair including a chemical which when moistened, will generate sufficient heat to impart a permanent wave to the hair, and means for delaying and then accelerating the natural development of the heat without raising its temperature and finally extending the development of the heat over a considerable period of time."

Plaintiff's Exhibit 4, box of New Ray pads, is charged here as evidence of infringement and are admitted to have been made by Lee, and their sale by the defendant Rader was shown.

Plaintiff's witness McDonough testified to having made quantitative and qualitative analyses of one of the New Ray pads taken from Exhibit 4.

The result of the qualitative analysis of that pad is shown in the bottom or fourth horizontal row of the chart Plaintiff's Exhibit 25.

In the first horizontal row of that chart is shown the qualitative analysis of plain-

tiff's original pad as marketed and as specifically described in the patents in suit. In the second horizontal row of this chart is shown a similar analysis of a later improved form, plaintiff's second commercial pad. In the third horizontal row is shown a still later improved form, plaintiff's third commercial pad.

The initial vertical column of this chart identifies the respective pads, while the first vertical column, indicating the qualitative analysis, shows for each respective pad the self heating material which acts upon the addition of water to generate the main heat supply employed to effect the curl, which heat supply, however, requires control for satisfactory commercial operation. The second vertical column of the chart shows for each respective pad the material or ingredient added thereto to effect control of the delay period; the third vertical column shows for each respective pad the material or ingredient added to effect control of the acceleration of heat generation upon termination of the delay period; and the fourth vertical column shows the material or ingredient added to each respective pad to effect control of the extension of heat generation, at a temperature approximating boiling water for a sufficient length of time to give a commercially satisfactory permanent wave.

Defendant's expert Ziegler testifies that there is no accelerator in defendant's mix and further testifies that the copper sulfate, shown as an accelerator for plaintiff's second commercial pad and for defendant's New Ray pad in the third column of Exhibit 25, is nothing more than a part of the copper sulfate employed in the main heat generating reaction involved in the first column of the chart for the same pads.

The witness Ziegler admitted that he was not an expert in the hair waving art; that he does not know if in a hydration reaction there is material which when moistened will generate heat sufficient to impart a permanent wave to the hair; that he had not studied the Sartory patents; that he does not know about the curling of hair and whether a lime oxide reaction would curl the hair; and does not know the effect of starch on such a reaction.

Ziegler never had occasion to consider problems of hair waving in the art of body warmers with which he was primarily familiar, and his testimony is in direct conflict with that of plaintiff's witnesses Evans, McDonough, and Snell, the latter being a consulting chemist of wide experience not connected with plaintiff's organization, all of whom are chemists proficient in the hair waving art. They established the fact that the quantity of copper sulfate required for the main heat generating reaction, or the so-called activating reaction, appearing in the first vertical column of Exhibit 25, was entirely independent of the additional quantity of copper sulfate appearing in the third vertical column of the chart which was required as an accelerator, and that these two respective quantities of copper sulfate each acted in the combination of the claims in a manner different from the other.

McDonough points out, and Snell confirms his view, that the difference of the chemical reaction of both tartaric acid and the copper sulfate in the third column, each reacting as an accelerator, from the reaction of copper sulfate in the first column, acting as activator of the main heat generating or self heating material.

McDonough further pointed out the exact proportions of copper sulfate employed as an activator and as an accelerator, respectively, both in plaintiff's second commercial pad and defendant's New Ray pad.

All of this is illustrated in the chart, Exhibit 25, which shows that only a part of the copper sulfate or potential copper sulfate is needed in the main or self heat generating agent, whereas a part of it is used as an accelerating agent. In the third column of the chart it is shown that the copper sulfate used as an accelerator can be replaced with tartaric acid, and that thus the tartaric acid and copper sulfate used as accelerator are equivalents.* That other substances, such as aluminum sulfate, could likewise be used as a substitute for this copper sulfate in order to obtain accelerating action was shown by Evans and McDonough. Ziegler admitted that tartaric acid is an accelerator.

The chart, Exhibit 26, shows the equivalency of tartaric acid and additional copper sulfate as accelerator.

The second chart prepared by McDonough, Exhibit 26, illustrates the effect of adding a delayer, an extender, and an accelerator of the character taught by the patents in suit to the basic heat generating composition shown in the several pads whose qualitative analysis is given in Exhibit 25, and emphasizes the adoption in the New Ray pad of plaintiff's improvements.

Defendant challenges Exhibit 26 to show infringement, and for its purposes cancels out the central portion of the chart, giving as his reason that it is impertinent, but I do not agree with defendant. I accept as true the testimony of Evans that plaintiff's second and third commercial pads, which defendant seeks to avoid, were evolved in accordance with the principles of plaintiff's first commercial pad specifically disclosed in the patents in suit. The identity between the New Ray pad and plaintiff's second commercial pad is fully established. The formula of the New Ray pad as shown on Exhibit 26 is not mutilated because a part of the copper sulfate employed in the New Ray pad is designated thereon as being employed as an accelerator, whereas the main portion has been designated as a portion of the self heating chemical, but is functionally analyzed, and this analysis is justified by the facts determined analytically in the laboratory. As admitted by Ziegler, defendant's expert, there is no reason to believe that the time periods shown on the chart are incorrect.

Defendant introduced a chart, Exhibit N, made by his expert Ziegler in an attempt to show that the use of talc in the New Ray pad has no effect as an extender. That chart was made during the trial with no opportunity on the part of plaintiff to check the manner in which the tests were conducted. Ziegler testified that the composition used by him in making up the chart was the one testified to by Reynolds and that he (Ziegler) does not know anything about the proportions used in Exhibit 4, New Ray pad, charged with infringement of the patents in suit. Reynolds admitted that he did not know the chemical composition of two of the ingredients he was using in the manufacture of New Ray pad; i. e., aluminum grindings and the talc. McDonough and Snell by separate analysis have shown the composition of Exhibit 4, New Ray pads, to be different from that testified to by Reynolds. That chart is not persuasive evidence.

Exhibit 41 shows the result of the analysis by Snell of defendant's bag, whose analysis was checked against the similar analysis of the same pad by McDonough, and this in turn with the composition of plaintiff's second commercial pad.

A comparison of these analyses shows that not only are substantially the same ingredients used, but that the proportions are essentially the same.

As a first item of notable difference, plaintiff's second commercial pad contains 53 grams of aluminum metal, while defendant's pad contains 39 grams by McDonough's analysis and 38 grams by Snell's analysis. This means that, comparing plaintiff's second commercial pad with the New Ray pad in Exhibit 26, plaintiff's pad when properly controlled is given a materially longer extension period. The use of less aluminum would cheapen the cost, but defendant could not escape infringement by reason of his pad being less efficient.

The second item of notable difference in proportions is the silicious matter which operates as an extender. In plaintiff's second commercial pad 2.86 grams of silica are used as the extender, whereas in defendant's pad by McDonough's analysis 3.80 grams feldspar are used and by Snell's analysis 3.95 grams of feldspar. The fact that the silica used in plaintiff's pad is more effective as an extender than crude feldspar used in defendant's pad accounts for the difference.

Both McDonough's and Snell's analysis of the New Ray pad show .24 grams of copper sulfate, but no direct comparison can be made on Exhibit 25 showing the initial ingredients of the several pads, as plaintiff introduces his copper sulfate as a potential substance to be generated from copper oxide and sodium acid sulfate when the heating composition is treated with water.

I cannot agree with defendant's expert Ziegler that the disclosure of the patent in suit is limited to the generation of heat by a hydration reaction such as the reaction of calcium oxide.

The quotation from page 1, line 5, of patent 1,919,690, "Heating chemical, such as calcium oxide, which, when moistened, will of itself generate sufficient heat to impart a permanent wave," does not support that construction, as the expression "such as calcium oxide" is given by way of example only, and the general statement does not limit the generation of heat, other than to any material which when moistened will of itself generate sufficient heat to impart a permanent wave to a tress of hair.

The generic language employed throughout the specification and claims contradicts such construction. At page 1, lines 10–12, the invention is stated to comprise "a novel means for controlling the development of heat generated by the self-heating chemical," without any limitations as to the char-

692

acter of such self heating chemical. A similar expression is found at page 1, lines 32, 33; 36, 37; 41, 42; 46; 50, 51; 55, 56; 65; 68, 69; 72, 73, and 91. In lines 24 and 25, page 1, reference is made to "the exothermically acting chemical," without other limitation. The claims cover "a chemical which when moistened will generate sufficient heat to impart a permanent wave to the hair," and are not limited to an exothermic or self heating chemical acting only by the hydration reaction. Many other types of exothermic reactions are well known, and the language employed throughout the patent is generic to all exothermic materials previously known which would satisfy the requirement of applicant's purpose. What has been said herein with reference to oxidation-reduction reactions applies equally to reactions involving change of valence.

The attempt by defendant's witness Ziegler to differentiate the manner in which heat is generated by the addition of water to the chemical in the disclosure of the patents in suit, from the manner in which it is generated in plaintiff's second and third commercial pads and in the New Ray pad, does not relieve from infringement. The generation of heat in the latter pads is initiated by the addition of water, and none of the claims is limited to the specific manner in which water affects the initiation of heat. The only limitation is that there will be a reaction to generate heat when water is added to the chemical employed. The plaintiff is entitled to its full range of equivalents of materials capable of producing the same effect, as the second and third commercial pads were a direct evolution from the principles disclosed in the patents in suit and employed the same principles.

The term "chemical" as used in the patents in suit is not limited to a single chemical compound but includes a group of substances such as shown in the second, third, and fourth rows, column 1, of Exhibit 25, constituting the main or self heating generating material of plaintiff's second commercial pad, third commercial pad, and the New Ray pad, as both the specification and claims of the patents in suit are sufficiently generic in the use of the term "chemical" to cover those ingredients. I accept as correct Snell's definition of the expression "a heating chemical" as used in the Evans patents, when he says, "It means any substance or combination of substances which would come within our usual terminology."

This brings us to the question of infringement, and I will consider it as to the three patents in suit separately.

Patent 1,919,690, claims 25 to 34, both inclusive, being in issue.

■ Exhibit 25 shows that each of these pads involve means for waving hair, including a chemical which, when moistened, will generate sufficient heat to impart a permanent wave to hair, and means for delaying, and their accelerating the natural development of heat without raising its temperature, and finally for extending the development of heat over a considerable period of time.

Claim 27, the example claim adopted for the purposes of this trial, is therefore satisfied as to all its limitations which are couched in the terms of the preceding paragraph, by all of the pads shown on Exhibit 25, including the defendant's New Ray pad, which infringes. In similar manner claims 25, 26, and 28 also are infringed.

When the pads shown on Exhibit 25, including the defendant's New Ray pad, are wetted with water in the performance of the contemplated method of waving hair, they inherently perform each of the steps of the method, in the definite sequence shown by Exhibit 25 and as defined in claims 29, 30, 31, 32, 33, and 34, which are accordingly contributorily infringed.

Defendant contends that there is no evidence whatever and no reason to suppose that in defendant's device the several ingredients relied upon by plaintiff as being, respectively, the delayer, the accelerator, and the extender of the patent function in the order required by these claims, and all of the evidence in this case contradicts that contention and in action defendant's New Ray pad follows the advance in the art made by Evans.

Patent 1,894,032, of which claims 1 to 6, both inclusive, are in suit.

■ This patent is directed to the control of the rate of acceleration of heat generated exothermically for the permanent waving of hair, the purpose being to speed up at the instant desired the generation of heat in order that the time of the operator and of the customer may be conserved. Claims of the character now appearing in patent 1,894,032 were originally presented in the application which resulted in the patent 1,919,690, but were required to be divided out of the latter case by the United States Patent Office.

All of the claims of this patent are predicated upon the disclosures in the first and third vertical columns of Exhibit 25.

Defendant contends that claim 6 of this patent is not infringed, for the alleged reason that defendant uses no aluminum sulphate. His contention is not sustained, for the reason that, in the reaction of the copper sulphate with the aluminum metal of the pad, aluminum sulphate is and must be formed to constitute an acidic material before the generation of heat can be accelerated.

Defendant is in error in his contention "that there is no pretense that any particle of the copper sulphate used in defendant's formula reacts or functions in any different manner from every other part thereof," as the evidence in this case shows that the two-thirds portion of the copper sulphate does actually react and function differently in the general reaction from the one-third.

Defendant contends that the ·New Ray pad has no accelerator; this contention is not sustained, as it clearly appears from Exhibit 26 and the testimony of McDonough that the New Ray pad has an accelerator.

Defendant errs in his contention that certain claims of the accelerator patent are limited to one which "accelerates the heat reaction without raising its temperature," because the claims referred to do not state that the heat reaction is accelerated without raising its temperature, but state that the natural development of the heat is accelerated without raising its temperature. The accelerator of the patents in suit steps up the generation of heat to make it reach hair waving temperature at the desired time, but does not raise the temperature above that which would be attained by the natural development of the heat by the main heating ingredients.

Claims 4, 5, and 6 of this patent involve means for accelerating the heat development and are therefore readable on the ingredients of the defendant's New Ray pad specified in the first and third vertical columns of Exhibit 25.

Claims 1, 2, and 3 of this patent are directed to steps of the method inherently performed in sequence when the ingredients of the first and third columns of the pads shown in Exhibit 25, including the defendant's New Ray pad, are wetted.

The claims in suit of patent 1,894,032 in suit are all infringed by defendant's New Ray pad.

Patent 1,892,426, of which claims 1, 2, 4, 7, and 8 are in suit.

This patent is directed to the control of the period of extension of heat generated by an exothermic material; that is, heat generated chemically, over the particular range of time necessary to most efficiently give a permanent wave, and is a subcombination of the combination claims of patent 1,919,690, hereinbefore considered.

Claims of the character now appearing in this patent were originally presented in the application which resulted in the patent 1,919,690, but were required to be divided out of the latter case by the United States Patent Office.

All of the claims in suit of this patent are predicated upon the disclosures in the first and third vertical columns of Exhibit 25.

Defendant erroneously contends that the New Ray pad has no extender and does not infringe. The existence of the extender is shown by Exhibit 26 and the testimony of McDonough.

As to the limitation of certain of the claims to means for extending the natural development of heat "without raising its temperature," to which defendant has made reference, the fact is that the extender materially reduces the natural peak temperature of the exothermic material.

Claims 7 and 8 of this patent, 1,892,426, involve means for extending the heat development and are therefore readable on the ingredients of the defendant's New Ray pad, specified in the first and fourth vertical columns of Exhibit 25.

Claims 1, 2, and 4 of this patent, 1,892,-426, are directed to the steps of the method inherently performed in sequence when the ingredients of the first and fourth columns of the pads shown in Exhibit 25, including the defendant's New Ray pad, are wetted.

All of the claims in suit of patent 1,-892,426 in suit are infringed.

On all the evidence which neither time nor space would warrant reciting, I can see no attempt in the defendant's New Ray pad to follow the prior art or the nonanalogous ·art pleaded by defendant, but it seems to me to be a copy of plaintiff's second commercial pad.

694

I am not impressed with the fact that the New Ray pad is licensed under patents earlier than those in suit, which patents were pleaded as anticipations herein, and have been determined by me not to anticipate, and further because these licenses were obtained after the defendant had already committed infringing acts.

The patents in suit are all of them valid as to the claims in suit, and all of the claims in suit of each of the patents in suit are infringed by defendant's pad, Exhibit 4.

A decree may be entered in favor of the plaintiff against the defendant, with injunction and costs, and the usual order of reference.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion for the assistance of the court as provided by Rule 70½ of the Equity Rules, 28 U.S.C.A. following section 723, and Rule 11 of the Equity Rules of this court.